FORD MOTOR COMPANY, Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Union Pacific Railroad Company,
Intervenor.

DEPARTMENT OF DEFENSE,
Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Seaboard Coast Line Railroad
Company, Intervenor.

Nos. 82–1630, 82–1748.

United States Court of Appeals,
District of Columbia Circuit.

Argued June 1, 1983.

Decided Aug. 9, 1983.

Robert N. Kharasch, Washington, D.C., for petitioner in 82–1630. David Larrouy, Dearborn, Mich., Olga Boikess and Edward D. Greenberg, Washington, D.C., were on brief for petitioner in 82–1630. Kathleen

Mahon, Washington, D.C., also entered an appearance for petitioner in 82–1630. Howard S. Scher, Atty., Dept. of Justice, Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Stanley S. Harris, U.S. Atty., and Anthony J. Steinmeyer, Atty., Dept. of Justice, Washington, D.C., were on brief for petitioner in 82–1748.

Craig M. Keats, Washington, D.C., Atty., I.C.C., with whom John Broadley, Gen. Counsel, and Ellen D. Hanson, Associate Gen. Counsel, I.C.C., Washington, D.C., were on brief for respondents in 82–1630 and 82–1748. Henri F. Rush, Atty., I.C.C., John J. Powers, III and Kenneth P. Kolson, Attys., Dept. of Justice, Washington, D.C., also entered appearances for respondents in 82–1630.

R. Eden Martin, with whom Robert B. Batchelder, Omaha, Neb., and Howard J. Trienens, New York City, were on brief for intervenor in 82–1630. Neill W. McArthur, Jr. and Charles M. Rosenberger, Jacksonville, Fla., were on brief for intervenor in 82–1748.

Before MIKVA, GINSBURG and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

The Interstate Commerce Commission (ICC or Commission), for most of its near-century existence, was heavily involved in regulating railroad rates to secure their reasonableness. Reform Congress ordered now calls for significant deregulation allowing "to the maximum extent possible, competition and the demand for services to establish reasonable rates." Staggers Rail Act of 1980 (Staggers Act), Pub.L. No. 96–448, sec. 101(a), 94 Stat. 1895, 1897 (codified at 49 U.S.C. § 10101a(1) (Supp. V 1981)). The two cases before us for review, *Ford Motor Co. v. Union Pacific Railroad*, 365 I.C.C. 630 (1982) (*Ford Motor*), and *Depart-*

*ment of Defense v. Seaboard Coast Line Railroad*, I.C.C. Docket No. 37925S (served May 10, 1982, sustained by 3–3 en banc decision served Oct. 12, 1982) (*DOD*), arise in the transition period through which the ICC is passing.

We reverse the Commission's decisions in both cases. The ICC's quick dismissals of the complaints in these cases bear the earmarks of a hasty route, not the measured passage from the old regime to the new for which Congress provided. And they rest upon the incorrect premise that failure to join all parties who have an interest in the controversy strips the Commission of its subject matter competence and its authority over the parties before it.

## I. STATUTORY FRAMEWORK

Until 1976, the ICC was charged with general superintendence of rates for transportation by rail. A "just and reasonable" standard controlled all rates, rail users could challenge the reasonableness of rates, at any time, and the Commission had authority to determine what constituted a just and reasonable rate in each case. *See* Interstate Commerce Act, ch. 104, §§ 1, 15, 24 Stat. 379, 384 (1887). Shrinkage of the ICC's rate control stewardship commenced with the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, 90 Stat. 31 (4–R Act). That legislation confined the Commission's maximum reasonable rate regulation to cases in which the railroad had "market dominance" over the traffic involved. 49 U.S.C. § 1(5)(b) (1976). Market dominance was defined as "an absence of effective competition from other carriers or modes of transportation, for the traffic or movement to which a rate applies." *Id.* § 1(5)(c)(i).[1]

In contrast to the decisions challenged in the instant petitions for review, decisions indicative of an agency overeager to relinquish control, in administering the 4–R Act the ICC displayed some reluctance to step

---

1. Without substantive amendment, this definition was included in the Staggers Act. As it appears in 49 U.S.C. § 10709(a), the definition reads: " 'Market dominance' means an absence

of effective competition from other carriers or modes of transportation for the transportation to which a rate applies."

back. The Commission gave the term "market dominance" an expansive interpretation. *See* H.R.Rep. No. 1035, 96th Cong., 2d Sess. 38, 115–17 (1980), U.S.Code Cong. & Admin.News 1980, p. 3978. Congress reacted to the ICC's encompassing reading, and moved further in the direction of deregulation in 1980 when it passed the Staggers Act. That Act largely removed rail rate regulation from ICC oversight. *See particularly* sections 201(a), 202, and 203(a) of the Staggers Act, 49 U.S.C. §§ 10701a, 10709, 10707a.

Two Staggers Act alterations are central to the cases before us. First, to circumscribe ICC market dominance determinations, Congress set a threshold; it directed the Commission to reject market dominance allegations, and therefore to dismiss complaints without reaching the issue of a rate's reasonableness, when the challenged rate returned revenues below a specified percentage of the variable costs of providing the service (160 percent prior to October 1, 1981, 170 percent currently). 49 U.S.C. § 10709(d)(2).[2]

Second, Congress provided a cutoff date for challenges even to market dominant rates. Shippers were given until March 30, 1981, 180 days after the October 1, 1980, effective date of the Staggers Act, to file complaints challenging rates. Under section 229 of the Staggers Act, 49 U.S.C. § 10701a note (savings provision), any rate not challenged in a complaint filed within the 180-day period,[3] or challenged unsuccessfully (because "(A) the rail carrier is found not to have market dominance over the transportation to which the rate applies, or (B) the rate is found to be reasonable") is deemed lawful. Such rates thereafter are immune from attack and may be adjusted upward, within statutorily prescribed limits, 49 U.S.C. § 10707a, without Commission surveillance.

## II. JOINT RATES AND THE COMMISSION'S JOINDER RULE

Both cases here on review, *Ford Motor* and *DOD,* involve "joint rates and through routes," arrangements under which freight is handled by more than one carrier, but charges are assessed jointly under a single rate. In contrast to "combination rate" service, in which each carrier collects its charges separately, in "joint rate" service, the delivering carrier bills and collects for all participating carriers and payments are divided among the participants according to a "divisions" formula.

Both petitioners filed complaints within the 180-day Staggers Act deadline; both complaints alleged, as the Act requires, that the participating carriers had market dominance and that the challenged rates exceeded a reasonable level for the involved traffic. Ford Motor Company (Ford) initially sought only prospective relief—Commission prescription of a reasonable rate for the future. The Department of Defense (DOD) sought only reparations—damages for past overcharges.

DOD named as a defendant only the delivering carrier, Seaboard Coast Line Railroad, although the rates DOD attacked, in most instances, involved movements over three carriers, and eleven carriers, in all, participated in the joint-line services.[4] Ford challenged a joint rate involving only two carriers; initially, Ford named both as defendants, but requested and was granted

---

**2.** After September 30, 1984, a "cost recovery percentage" will govern. *See* 49 U.S.C. § 10709(d)(2)(E).

 If the statutory threshold is not met, lack of market dominance is conclusively established. If it is met, a conclusion of market dominance is not automatic. *Id.* § 10709(d)(4). Nor does a finding of market dominance establish that a rate is unreasonably high; the finding merely authorizes the Commission to proceed to an adjudication of the reasonableness of the rate.

**3.** The 180-day cutoff does not apply to "paper rates"—rates on which minimal traffic had moved when the Staggers Act became effective. *See Baltimore Gas & Elec. Co. v. ICC,* 672 F.2d 146, 148 (D.C.Cir.1982).

**4.** Twelve carriers participated when DOD filed its complaint; two of them, Seaboard Coast Line Railroad and Louisville & Nashville Railroad, merged on December 29, 1982, to form Seaboard System Railroad. *See* Brief for Intervenor in *DOD* at ii n. 1.

an order dismissing the complaint against one of them when that carrier and Ford reached a settlement set out in a contract filed with the Commission. ICC Rule 25(c), the Commission's joinder of defendants rule, 49 C.F.R. § 1100.25(c) (1981),[5] which pre-dates the Staggers and 4–R Acts, provides in relevant part:

> If complaint is made with respect to through transportation by continuous carriage or shipment, all persons subject to the act participating therein, *and against which an order is sought, should be made defendants.*

(Emphasis supplied.)

The ICC dismissed the Ford Motor and DOD complaints peremptorily as incurably defective. The Commission maintained that it "lacked jurisdiction" over the complaints absent joinder of *all* participating carriers. This "jurisdictional impediment" was insurmountable, the ICC reasoned, because Commission precedent established that additional parties could not be joined once the Staggers Act 180-day grace period had passed. *See Columbian Chemicals Co. v. Atchison, Topeka, & Santa Fe Railway,* ICC Docket No. 38246S (served Sept. 10, 1981) (rejecting amendment adding parties after March 30, 1981, deadline, but not dismissing original complaint).

### III. The Commission's Jurisdiction Over the Ford Motor and DOD Complaints

In the sections that follow, we describe separately for each case the parties' positions and the ICC's course. We note at the outset, however, a confusion or misperception that pervades the Commission's decisions and its briefs to this court. The term jurisdiction, in the context here relevant, refers to a tribunal's adjudicatory authority over the subject matter and parties before it. *See generally* Restatement (Second) of Judgments ch. 2 introd. note at 27–28, §§ 1, 11 (1980); 13 C. Wright, A. Miller & E.

Cooper, Federal Practice and Procedure § 3522 (1975). Like the adjudicatory authority of a federal court, the ICC's subject matter jurisdiction or competence—the kinds of controversies it may adjudicate—is prescribed by Congress, and is not determined by the Commission's own notions of authority it should or should not have.

 Failure to join a party, even one determined, after the requisite careful, practically-oriented analysis, to be needed for just adjudication, indeed even one so needed as to attract the conclusion-reporting label "indispensable,"[6] *never* strips a tribunal of its subject matter jurisdiction or of its authority over the persons before it. A tribunal which has jurisdiction over the subject matter of a claim generally may impose no dispositive order on an absentee, but it unquestionably has power to enter orders binding the parties it confronts. When a tribunal, such as the ICC in this case, has authority over the subject matter to which the complaint relates, but nonetheless declines to proceed without an absentee, it does so as an exercise of judgmental discretion, not for any want of power to affect the interests of existing parties. *See* 7 C. Wright & A. Miller, Federal Practice and Procedure § 1611 (1972); *see also Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 118–19, 122, 88 S.Ct. 733, 742–43, 744, 19 L.Ed.2d 936 (1968); *Park v. Didden,* 695 F.2d 626, 627 & nn. 2 & 10 (D.C.Cir.1982).

Indeed, the Commission concedes that the defect it now labels "jurisdictional," therefore fatal, becomes "non-jurisdictional," a surmountable impediment, when the absentee is a foreign carrier. *See H.K. Porter Co. v. Central Vermont Railway,* 366 U.S. 272, 81 S.Ct. 1341, 6 L.Ed.2d 284 (1961); *National Insulation Transportation Committee v. Aberdeen & Rockfish Railroad,* 365 I.C.C. 624 (1982) (*NITCOM*). Even when absentees are domestic carriers, and

---

**5.** The Commission's Rules of Practice were recodified in November 1982. *See* Revision and Redesignation of the Rules of Practice, 47 Fed. Reg. 49,534 (1982). Under the current codification, Rule 25(c) appears at 49 C.F.R. § 1131.6 (1982). Citations in this opinion are to the 1981 codification.

**6.** *See* Fed.R.Civ.P. 19 advisory committee notes on the 1966 amendments.

therefore could have been joined because they are subject to the ICC's governance, the Commission, on another day, did not conclude, as it did in the cases at hand, that it *must* dismiss the parties before it for lack of jurisdiction over their dispute. *See Columbian Chemicals Co., supra.*

Because the Commission in these cases was "misled by the 'jurisdiction' fallacy," it "did not undertake the relevant inquiry." Fed.R.Civ.P. 19 advisory committee notes on the 1966 amendments; *see* C. WRIGHT, LAW OF FEDERAL COURTS 465 (4th ed. 1983) ("The cases sometimes speak, and even act, as if the failure to join a party who may be regarded as 'indispensable' is a 'jurisdictional' defect. This heresy has been rejected over and over again by authoritative cases."). The ICC rushed to dismiss apparently believing it "had no choice but to terminate the proceeding immediately." Brief for the ICC in *DOD* at 28. Instead, it should have recognized that the cases called for an intelligent exercise of discretion following careful consideration of the particular consequences of the courses open to it. Mindful of its decision not to allow joinder of additional parties once the Staggers Act deadline had passed,[7] the ICC should have determined whether the fairer course was to dismiss peremptorily or to proceed to make the market dominance determinations that would control its further action.

## IV. DOD

### A. *Commission Proceedings*

Three days short of the Staggers Act rate challenge deadline, on March 27, 1981, the Department of Defense (DOD) filed a complaint for reparations (damages) against Seaboard Coast Line Railroad (Seaboard).[8] The complaint alleged that Seaboard, as delivering carrier, participated with other carriers in the movement of DOD ammunition and explosive shipments to the Military Ocean Terminal, Sunny Point, N.C., that "[Seaboard] and other participating railroads had market dominance within the meaning of [49 U.S.C. § 10709]," [9] and that the rates complained against exceeded a reasonable level by more than $4 million. Joint Appendix (J.A.) 6–9.[10]

Seaboard moved to dismiss asserting principally that it lacked market dominance over the traffic involved. J.A. 43–53. In a short section of its motion, J.A. 46–47, Seaboard urged that the complaint "should also be dismissed" for violation of the ICC's joinder of defendants rule, 49 C.F.R. § 1100.25(c) (1981) (set out *supra* pp. 1159–1160), since none of the other carriers participating in the several joint-line rates DOD challenged had been made defendants.[11] The bulk of Seaboard's presentation, however, dealt with procedures Seaboard recommended to the Commission for hearing and deciding the threshold market dominance question.

Seaboard claimed in its motion that there was "no need for discovery by [DOD] prior to the filing of its market dominance evidence"; Seaboard stated in explanation that, under the relevant provision of the Staggers Act, 49 U.S.C. § 10709(d)(3), "detailed costing of the movements in question" was "not required" and DOD could use "Rail Form A costs" which were "readily available to any complainant." J.A. 50 n.

---

7. Nothing precludes the Commission, however, from "encouraging" voluntary participation by carriers not named as defendants. *Cf. NITCOM, supra,* 365 I.C.C. at 627 (Canadian carriers "encouraged," in their "self-interest," to provide accurate information to the Commission concerning their portion of joint rate).

8. *See supra* note 4.

9. DOD attached exhibits supporting its allegations, including its contention that collective revenue-variable cost percentages on the considered traffic exceeded 200 percent, a ratio well above the Staggers Act market dominance threshold. Joint Appendix (J.A.) 11–41; *see supra* pp. 1158–1159.

10. This opinion designates the Joint Appendix filed in *DOD* as J.A., and the one filed in *Ford Motor* as J.App.

11. Perhaps recognizing that violation of the ICC's joinder rule might result in dismissal as an exercise of discretion, but did not compel dismissal, *see supra,* pp. 1160–1161, Seaboard made no claim that DOD's failure to join all carriers created a "jurisdictional" defect.

5.[12] In conclusion, Seaboard repeated that its motion to dismiss and recommended procedural schedule were "designed to direct the Commission's inquiry to the threshold market dominance determination as a preliminary matter." J.A. 52.[13]

As it turned out, the Commission never embarked on the inquiry contemplated in Seaboard's recommended procedural schedule. In a terse order, the Administrative Law Judge (ALJ), on November 4, 1981, granted the motion to dismiss, J.A. 64; he stated as the sole reason for his action DOD's failure "to name all necessary parties." Apart from quotation of the Commission's joinder of defendants rule, the ALJ cited only one authority in support of his disposition: *Mayo Shell Corp. v. Chicago, Rock Island & Pacific Railroad,* 293 I.C.C. 243 (1954).

DOD appealed, urging immediate reversal because *Mayo Shell,* far from supporting dismissal of the complaint, was prime authority for its retention. J.A. 68. In that decision, the ICC distinguished between a future rate prescription case and a reparations claim. The Commission, in *Mayo Shell,* stated the general rule that all carriers should be joined when a future rate prescription is sought, but added that "failure to name all participating carriers is not a bar to consideration of a reparation claim, . . . [it suffices that] one of the carriers participating in the through haul is a defendant." 293 I.C.C. at 246.

Upon receipt of a copy of DOD's appeal, the ALJ, on his own motion, vacated his November 4, 1981, order and immediately issued another one. The ALJ's second order, dated November 17, 1981, deleted the reference to *Mayo Shell* and acknowledged

that "Rule 25(c) appears to limit 'participating' carriers merely to those 'against which an order is sought.'" This appearance, the ALJ then declared, is "not . . . controlling." He stated, without elaboration, that "[f]ailure to name as defendants all railroad carriers participating in a through movement under a through rate virtually would render market dominance a meaningless concept." J.A. 71.[14] In this corrected order, the ALJ also noted the ICC's decision in *Columbian Chemicals Co., supra;* the ALJ failed to observe, however, that the ICC, in *Columbian Chemicals Co.,* left the original complaint standing despite the Commission's refusal to permit joinder, after the Staggers Act deadline date, of additional joint-rate participants.

DOD appealed the ALJ's second order, asserting that proof of collective market dominance could be adduced, as even Seaboard's motion indicated it could, without naming the originating and intermediate carriers on the routings in question. DOD further argued that, whatever shifts in position the ICC had arrived at after the Staggers Act rate challenge deadline, it would "make[ ] no sense to dismiss complaints for failing to adhere to rules which were not issued until after the Complaint was filed." J.A. 78.

Division 1 of the Commission, in an order served May 10, 1982, denied DOD's appeals. J.A. 90. In explanation of its disposition, Division 1 supplied only an unadorned citation to the Commission's decision in *Ford Motor,* served April 19, 1982, which retroactively overruled *Mayo Shell* to the extent that *Mayo Shell* sanctioned reparations complaints against fewer than all joint-rate carriers. DOD then sought full Commission

**12.** Rail Form A is a cost accounting procedure, used in determining rail freight service costs, that allocates actual expenditures to various rail services. *See Cleveland-Cliffs Iron Co. v. ICC,* 664 F.2d 568, 580–81 (6th Cir.1981). Following the Commission's lead, Seaboard changed its position on appeal and now questions the utility of Rail Form A. *See* Brief for Intervenor in *DOD* at 18–19.

**13.** Seaboard requested the Commission to decide its motion "following the completion of

[the market dominance] evidentiary phase." J.A. 51.

**14.** Seaboard made no such assertion in its motion to dismiss. As earlier observed, its principal effort was to urge a bifurcated proceeding in which all evidence on market dominance would be aired before the reasonableness of any rate was scheduled for hearing. J.A. 47–53.

review; DOD pointed out once more that its complaint complied with published Commission rules and precedent extant on the date of filing, and it requested an opportunity to adduce costing evidence adequate to show collective market dominance.

The full Commission divided 3–3; that vote left Division 1's decision as the Commission's final judgment. J.A. 104. Commissioner Sterrett, joined by two other Commissioners, set out his reasons for concurring in the result. J.A. 105–11. His statement does not qualify as a Commission opinion; in the record on this petition for review, however, it is the only attempt at full articulation of reasons for the dismissal of DOD's complaint.[15]

According to Commissioner Sterrett, nothing new occurred in the disposition of DOD's challenge. When the 4–R Act introduced the market dominance concept, Commissioner Sterrett sought to explain, the joinder requirement in reparations proceedings changed. True, the Commission never said so explicitly prior to its April 1982 *Ford Motor* decision; it did not amend its joinder rule, nor did the statute speak directly to the point. Nonetheless, DOD's reliance on *Mayo Shell* was unreasonable, Commissioner Sterrett thought, because "[t]hat case was decided before the market dominance provisions were enacted, and is automatically overruled by statute." J.A. 108.

Commissioner Sterrett believed that ever since 1976 the Commission has held the "opinion that a carrier-specific [market dominance] finding [is] necessary for each joint-line party to a rate," J.A. 108, and that "[i]t is simply impossible, when all participants to a joint movement are not made defendants, to make the requisite jurisdictional finding that each involved carrier has market dominance for its portion of the

movement." J.A. 107. The statute, Commissioner Sterrett said, although "silent on [the joinder] point," made the necessity of a finding of market dominance against each carrier "clear." J.A. 106 n. 3.

Commissioner Sterrett acknowledged that the Commission had not rigidly adhered to the "all participating carriers must be named defendants" position in *NITCOM, supra,* and in *Columbian Chemicals Co., supra. NITCOM,* Commissioner Sterrett said, was limited to joint rates involving Canadian carriers, J.A. 109; *Columbian Chemicals Co.* did not squarely present the issue, he ventured, because "[n]o defendant asked for dismissal of the entire proceeding," and "[i]t may be that ... complainant had joined sufficient carriers [8 out of 12] to permit a market dominance finding for a particular routing(s)." J.A. 110 & n. 6.[16]

Chairman Taylor, in dissent, said "[t]he question here is one of fairness." J.A. 112. It would be inequitable, he believed, to "foreclose[ ] DOD's right ever to obtain a hearing to seek reparations of the allegedly unlawful charges" based on the combined effect of the ICC's 1982 decision in *Ford Motor* retroactively overruling *Mayo Shell,* and the Commission's refusal (announced in *Columbian Chemicals Co.,* served Sept. 10, 1981) to allow joinder of additional parties after the March 30, 1981, complaint cutoff date. J.A. 112. Chairman Taylor thought the Commission's joinder rule "might be interpreted to require joinder of all participating carriers in all complaint cases." J.A. 113. Prior to *Ford Motor,* however, the Commission had never published an interpretation to that effect. Moreover, Chairman Taylor found "recent statutory and decisional changes" less clear than did Commissioner Sterrett: "[T]hey do not explicitly and ineluctably require the joinder of all parties in a reparations complaint"; the

---

**15.** *Cf.* Brief for Intervenor in *DOD* at 17 (page in Commissioner Sterrett's statement cited as the ICC's "decision in this proceeding").

**16.** If nonjoinder strips the ICC of "jurisdiction" (power or authority) to proceed, as the Commission erroneously argues it does, the ICC would not have discretion to make an exception for cases, such as *NITCOM,* involving Ca-

nadian carriers, and it should have dismissed *Columbian Chemicals Co.* on its own motion. *Cf. Ford Motor,* 365 I.C.C. at 631, 634 (Ford's complaint dismissed on Commission's own motion); Brief for the ICC in *DOD* at 28 (when jurisdictional defect is detected agency has "no choice"; it must "terminate the proceeding immediately").

Staggers Act savings provision "only requires that the complainant *allege* market dominance to file its complaint"; the Commission had pointed out in *NITCOM* that "a market dominance determination is simply more difficult, but not impossible, to make in the absence of all participating carriers." J.A. 113–14 (emphasis in original).

Chairman Taylor acknowledged that "to obtain the most accurate cost and revenue data possible . . . , all carriers participating in a joint rate should be joined in the complaint." J.A. 114 n. 1. He agreed with the Commission's reasoning to that effect in *Ford Motor.* But he would apply *Ford Motor* in reparations proceedings only prospectively, so that affected persons would have notice and an opportunity to comply. It was "fundamentally unfair," he concluded, to dismiss DOD's complaint despite its compliance with "the governing regulations and the relevant case law existing at the time of filing." J.A. 114–15. The Commission, he believed, had precluded DOD not because of any legislative direction, and not because DOD failed to observe published ICC positions; rather the result was reached in the interest of "administrative convenience," because it is "more difficult, but not impossible," for the ICC to grapple with market dominance when only one joint rate participant is a named defendant. J.A. 114–15.

## B. *Analysis*

The ICC asks us (1) to decide whether "the market dominance provisions of the 4–R Act require joinder of all participating railroads in a complaint for damages," and (2) to bypass the "procedural entanglements" and "adornments" on which DOD focuses. Brief for the ICC in *DOD* at 14, 16. Addressing the first request, we conclude that the Commission confuses administrative action authorized by the 4–R and

Staggers Acts with action the legislation commands. As to the matter on which DOD focuses, we agree with Chairman Taylor: the critical question in this case is not the tenor of permissible long-term regulation, it is the fairness of the ICC's approach to complaints filed under the pressure of the Staggers Act rate challenge deadline.

The 4–R Act supplies a definition of market dominance [17] and provides one relevant command: "[N]o rate shall be found to be unjust or unreasonable . . . unless the Commission has first found that the proponent carrier has market dominance over such service." 49 U.S.C. § 1(5)(b) (1976).[18] The 4–R Act, in this context, does not mention joint rates or party joinder, nor does the Staggers Act. Indeed, the Commission concedes as much. *See* Brief for the ICC in *DOD* at 13. The ICC acknowledges too that "[t]he legislative history of the 4–R Act does not disclose whether Congress thought about the specific question of who must be joined in a complaint concerning a joint rate." *Id.* at 18 n. 13. The same is true, so far as we can tell, of the Staggers Act legislative history.

■ Like Chairman Taylor, we find nothing in the 1976 and 1980 legislation that "ineluctably require[s] the joinder of all parties in a reparations complaint." J.A. 113–14. Nor do we believe that such a requirement must be implied in order to equip the ICC to determine market dominance. As the Commission's own precedent suggests, it may well be more onerous, but it is "not impossible," for the ICC to resolve a market dominance issue in a joint-rate case in the absence of all participating carriers. *See* J.A. 114; *NITCOM, supra; cf. Columbian Chemicals Co., supra.*[19]

While we do not read into the spaces Congress left a *command* that the ICC "require joinder of all participating railroads in a complaint for damages,"[20] we do not

---

**17.** *See supra* p. 3.

**18.** The Staggers Act provision regarding market dominance appears at 49 U.S.C. § 10709.

**19.** The ICC could invite voluntary participation by carriers not named as defendants, *see supra*

note 7, and it could subpoena testimony or documents. *See* ICC Rule 54, 49 C.F.R. § 1100.54 (1981).

**20.** Brief for the ICC in *DOD* at 14.

doubt the Commission's authority to shape a sensible party joinder rule to facilitate market dominance determinations. In fact, there is no dispute on this point. DOD does not question "the ICC's authority to overrule *Mayo Shell* [which stated it sufficed in reparations cases challenging joint rates to name only one carrier] ... and to establish a new [joinder of defendants] rule for *future* cases." Brief for the Petitioner in *DOD* at 13 (emphasis in original).[21]

As our account of the proceedings before the Commission indicates, DOD did not have the benefit, prior to the complaint-filing deadline, of any announcement from the Commission that, on pain of dismissal and permanent preclusion, a joint-rate reparations complaint must join all carriers.[22] Lacking fair notice, DOD reasonably could not be expected to conform its complaint to the requirement the Commission ultimately stated. The peremptory dismissal of DOD's rate challenge, we believe, fully warrants the description, arbitrary and capricious administrative action. *See e.g., Hatch v. Federal Energy Regulatory Commission,* 654 F.2d 825, 835 (D.C.Cir.1981) (agency must accord parties notice and meaningful oppor-

tunity to meet new standard); *Greyhound Corp. v. ICC,* 551 F.2d 414, 416 (D.C.Cir. 1977) ("This court emphatically requires that administrative agencies adhere to their own precedents or explain any deviations from them."). *See generally* K. DAVIS, ADMINISTRATIVE LAW TREATISE § 17.07 (Supp. 1982).[23]

We note here a concern heightened at oral argument in this case. The ICC emphasized that its insistence on joinder of all participating carriers is intended to insure that the Commission, before ruling on market dominance, will have before it the most accurate cost and revenue data possible. *See* J.A. 109 n. 5, 110, 114 n. 1; Brief for Intervenor in *DOD* at 18–19. But we are not confident that the ICC, even today, has securely resolved what a "collective" market dominance finding entails and, specifically, whether, as Commissioner Sterrett stated, "the requisite jurisdictional finding [is] that each involved carrier has market dominance for its portion of the movement." J.A. 107.

Asked at argument whether Commissioner Sterrett's statement accurately reflects

---

**21.** Such a rule need not impose an unbending requirement. *Cf.* Fed.R.Civ.P. 19 (designed to foster practical determination of the need for a particular party's participation). It might well accommodate not only cases involving foreign carriers, *see NITCOM, supra,* but, as Commissioner Sterrett suggested, J.A. 110 n. 6, others in which market dominance can be determined reliably without the joinder of every carrier, and in which sufficient cause has been shown for proceeding without the full line-up of originating, intermediate, and delivering carriers.

**22.** Seaboard suggests that DOD alone failed to forecast what was "obvious." Brief for Intervenor in *DOD* at 13–14. But both the ICC and Seaboard refer to other shippers, allegedly similarly situated, whose complaints were dismissed on nonjoinder grounds after the Staggers Act rate challenge deadline, and without any opportunity for curative amendment. *See* Brief for the ICC in *DOD* at 21 n. 15; Brief for Intervenor in *DOD*, Appendix B. These references contradict the assertion that DOD alone lacked the farsightedness to predict the ICC's eventually-announced view. Nor do we share Seaboard's security that from 1976–1981 "all other complainants ... named all carriers participating in a joint rate as defendants in reparations complaints." Brief for Intervenor in

*DOD* at 14. The record does not adequately reveal what complainants did from 1976–1981 or how the ICC reacted. Moreover, there was no complaint filing deadline to meet prior to the Staggers Act cutoff. A shipper, until 1981, who named only one carrier could, if so instructed by the ICC, amend a complaint to join additional defendants and thereby avoid dismissal.

**23.** The ICC describes "[t]he prevailing decisions of the ALJ and the division" as "rational" and "well articulated." Brief for the ICC in *DOD* at 15. We disagree. The Commission does not defend the ALJ's first dismissal order, which incorrectly relied on *Mayo Shell*. The ALJ's substitute order offers little in the way of reasoned explanation. Division 1 did not explicitly adopt the ALJ's statement; it simply cited *Ford Motor*. Commissioner Sterrett and ICC's counsel on appeal essayed reasons, but these *post-hoc* efforts are not acceptable substitutes for adequate, contemporaneous justification of agency action. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* — U.S. ——, ——, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983) ("an agency's action must be upheld, if at all, on the basis articulated by the agency itself," "courts may not accept appellate counsel's *post-hoc* rationalizations").

the ICC's view, counsel for the ICC responded ambiguously. Initially, he said:

[Y]ou really can't do it that way, you can't make that kind of a finding, and the statute requires that the movement itself be market dominant, not any individual segment of the movement.

After further colloquy, counsel ventured:

[Commissioner Sterrett] did not really say [that it is necessary to find that each involved carrier had market dominance for its particular portion of the movement]. He said that you have to make a finding that the movement itself is market dominant and he said you also have to make a finding that each carrier is market dominant.

Counsel for DOD expressed uncertainty, which the court shares:

At one point the ICC says in its brief [at p. 18], "collective market dominance." ... That's what must be shown. Commissioner Sterrett's [statement], at [J.A.] 107, talks about segmenting out each carrier, showing for each carrier that portion of the route which they [sic] carried and showing market dominance with respect to each part.

.... [F]rom the ICC we don't know what is right.

It may be that the Commission has a clear position, and that the problem is one of communicating it intelligibly. In any event, for the benefit of the public it serves, the ICC should attempt to restate, cogently, the ingredients of the "collective determination" it will make, how it will combine those ingredients, and the approach it will take hereafter to joinder of parties.[24]

In the case at hand, because it is too late under ICC precedent to join additional defendants, we hold, in agreement with Chairman Taylor, only this: the dismissal of DOD's complaint was an abuse of discretion; the complaint should be reinstated;

**24.** Because the existing ICC joinder rule, in the past, was not construed to require joinder of more than one carrier in a joint-rate reparations case, see Brief for the ICC in DOD at 5–6, express announcement of the changed interpretation would be consistent with the "principles

guided by its proceedings in NITCOM, the Commission should afford DOD an opportunity to prove its allegation that "[Seaboard] and other participating railroads had market dominance within the meaning of [49 U.S.C. § 10709]." J.A. 8.

## V. FORD MOTOR

### A. Commission Proceedings

Ford Motor Company (Ford), like DOD, filed its rate challenge on March 27, 1981, three days before time ran out under the Staggers Act savings provision. Ford protested, as unreasonably high, a joint rate charged by two carriers, the Union Pacific Railroad (Union Pacific) and the Missouri-Kansas-Texas Railroad (MKT). The challenged joint rate applied to soda ash moved by Union Pacific from mining facilities at Green River, Wyoming, to Kansas City, Missouri, and from there by MKT to Ford's plant near Tulsa, Oklahoma. Ford named both carriers as defendants; it asked the Commission to reduce the charge, prospectively, to a reasonable level. Joint Appendix (J.App.) at 5–10.

Ford's complaint was one of several hundred the Commission received in the Staggers Act last-chance-for-rate challenges 180-day period. Faced with an extraordinary case load bulge, the Commission sensibly promoted private settlement. It announced in a May 1, 1981, statement:

We have received just under 800 complaints. Their nature and their number require adopting special procedures for their handling. More importantly, we want to encourage and provide for negotiation and settlement of as many of these complaints as possible. It is our view that rate agreements between carriers and their customers are far better than a series of expensive and time consuming adjudications.

of fairness" to which the Commission aspires. See NITCOM, supra, 365 I.C.C. at 628; Ford Motor, supra, 365 I.C.C. at 633. But cf. Brief for the ICC in DOD at 15, 27, 31 (old rule may be accommodated to new law without express announcement).

46 Fed.Reg. 24,740 (1981). And in individual notices mailed with copies of complaints, the ICC asked defendants in savings provision cases to report whether settlement negotiations were underway, and whether a conference, presided over by an ALJ, would assist in resolving the dispute. J.App. 11.

Ford initiated settlement discussions with both carriers. It reached no agreement with Union Pacific, but negotiated a contract with MKT for an allowance on soda ash moved on MKT's lines from Kansas City to Ford's plant near Tulsa.[25] The allowance would end, automatically, if the ICC ordered a reduction in the joint rate. In that event, MKT would retain its full share of the lowered joint rate, with no return to Ford.

In August 1981, Ford informed the ICC of the settlement, requested permission to withdraw its complaint against MKT, J.App. 12,[26] and filed the Ford-MKT rate allowance agreement with the Commission. *See* Brief for the ICC in *Ford Motor,* Appendix B.[27] By order served September 4, 1981, the ALJ granted Ford's request and dismissed MKT from the rate challenge proceeding. J.App. 32.

Union Pacific, initially joined by MKT, had moved to dismiss Ford's complaint on the ground that competition from other railroads and other origins for soda ash moving to Oklahoma precluded a finding of market dominance. J.App. 13–21; *see supra* notes 1, 2. When the ICC approved withdrawal of the complaint against MKT,

Union Pacific filed a second dismissal motion. J.App. 76–83. Essentially, it claimed that dropping MKT as a party-defendant was fatal to Ford's complaint: MKT was a "necessary party," Union Pacific asserted; without MKT, the ICC had "no authority" to prescribe a through rate. In support, Union Pacific cited the Commission's joinder of defendants rule, *see supra* pp. 1159–1160, and ICC precedent applying the rule to require complainants seeking a rate prescription to name as defendants all joint-rate participants.

Ford's reply, J.App. 84–96, noted that the Commission had jurisdiction over the subject matter and Union Pacific and that, unlike the complainants in the cases Union Pacific cited, Ford had initially designated both joint-rate participants as defendants. Above all other considerations, Ford emphasized the Commission's policy favoring settlement; Ford maintained that Union Pacific, the nonsettling carrier, should not be allowed to turn that policy to its advantage. It would be unfair, Ford argued, for the ICC to reject the complaint against Union Pacific in view of the Commission's encouragement of negotiations of the very kind Ford and MKT successfully pursued, and the Commission's order permitting withdrawal of the complaint against MKT. Ford simultaneously sought leave to add to its complaint a prayer for reparations of approximately $970,000. J.App. 97–142.

In a concise order served November 10, 1981, the ALJ denied Union Pacific's mo-

---

**25.** Prior to the Staggers Act, the legality of a rate agreement between shipper and carrier presented a cloudy question. *See Burlington N. R.R. v. ICC,* 679 F.2d 934 (D.C.Cir.1982). Section 208 of the Act, 49 U.S.C. § 10713, expressly authorized carriers and shippers to enter into service- and rate-setting contracts. Rates set by contract apply only to the contracting parties; the published rate remains applicable to others. *See* H.R.Rep. No. 96–1430, 96th Cong., 2d Sess. 100 (1980), U.S.Code Cong. & Admin.News 1980, p. 3978.

**26.** Ford's initial letter notifying the ICC of the successful negotiation with MKT, dated August 11, 1981, apparently caused some confusion: it erroneously referred to ICC Docket No. 38423–S, a separate complaint filed by Ford against MKT. *See* Brief for the ICC in *Ford Motor,*

Appendix C; J.App. 12, 22. To clarify its position, Ford sent a second letter, received by the ICC August 28, 1981, in which Ford correctly stated the docket number and noted explicitly that it "wish[ed] to continue its protest against the [Union Pacific]." J.App. 22.

**27.** The Staggers Act requires the Commission to approve rate contracts filed with it unless the Commission determines, in a proceeding initiated by the ICC or a complainant who is not a party to the contract, that the contract violates the Act. *See* 49 U.S.C. § 10713(c), (d). If the Commission has not disapproved a contract within 60 days after the contract is filed, the contract automatically becomes effective. *Id.* § 10713(e). The Ford-MKT contract was not challenged and became effective as specified in 49 U.S.C. § 10713(e).

tion to dismiss for failure to join a "necessary" defendant:

> [Ford] named MKT in its complaint. MKT was subsequently dismissed as a result of its reaching a settlement agreement with Ford. Under these circumstances, the absence of MKT as a party in the proceeding is not a proper basis for the dismissal of the complaint.

J.App. 143. The same order denied Ford's request to amend the complaint to seek retrospective as well as prospective relief. Once the Staggers Act savings provision rate challenge deadline had passed, the ALJ ruled, it would be inappropriate to allow substantive amendments "perfect[ing] or otherwise chang[ing] the remedies sought." J.App. 143.

On Ford's appeal from the ALJ's denial of leave to amend,[28] the full Commission, acting on its own motion, dismissed the complaint. *Ford Motor Co. v. Union Pacific Railroad,* 365 I.C.C. 630 (1982). It declared MKT a "necessary" defendant whose elimination caused the Commission to lose "jurisdiction." *Id.* at 630, 631, 634. In prescription cases, the ICC said, it had routinely required joinder of all carriers participating in a joint rate. *Id.* at 631. That rule, the Commission announced, is equally appropriate in reparations cases and *Mayo Shell, see supra* pp. 1162–63, to the extent that it looked the other way, had become obsolete and "is overruled." 365 I.C.C. at 634. In

1954, when *Mayo Shell* was decided, the ICC explained, "rate comparisons were the primary benchmark of maximum reasonableness." *Id.* at 631. Today, the Commission's approach is cost-based. *Id.* at 632. It is "impossible," the ICC asserted, to determine the reasonableness of a joint rate or market dominance "in the absence of cost evidence for all participating railroads." *Id.; cf. supra* p. 1163 (Commissioner Sterrett's assertion in *DOD* that it is "impossible" to resolve market dominance issue when all participants in joint movement are not made defendants).

The Commission acknowledged that it managed to make determinations on "the reasonableness of joint rates with respect to a single carrier participant" in cases involving Canadian or Mexican railroads. 365 I.C.C. at 633. But those cases[29] present "unique circumstances," the Commission said; they illustrate a readiness "to apply [ICC] rules and decisional criteria liberally to ensure that justice is not denied." *Id.*[30] Ford's situation did not attract similar solicitude; the Commission attributed "Ford's plight" to "its own precipitous action in requesting that MKT be dismissed as a party." *Id.* at 634.

### B. *Analysis*

One question is squarely before us: Did the ICC err in ruling that it "lack[ed]

---

**28.** The ICC Rules of Practice do not permit an immediate appeal from the denial of a motion to dismiss. *See* 49 C.F.R. §§ 1100.85, 1100.-98(b) (1981). Union Pacific contended that Ford's immediate appeal from the ALJ's denial of the motion to amend the complaint was also impermissible. J.App. 155–56. The Commission did not address the question whether Ford's appeal could be pursued, either as a permissible appeal from an interlocutory ruling, or as an appeal of right from a disposition that qualified as an "initial decision" of the ALJ because it "completely disposed of [the] reparations claim." *See* J.App. 144 n. 1, 170.

**29.** The Commission cited two: *Canada Packers, Ltd. v. Atchison, T. & S.F. Ry.,* 385 U.S. 182, 87 S.Ct. 359, 17 L.Ed.2d 281 (1966), and *H.K. Porter Co. v. Central Vt. Ry.,* 366 U.S. 272, 81 S.Ct. 1341, 6 L.Ed.2d 284 (1961).

**30.** Two days before its decision in this case, the ICC ruled, in a case to determine the reasona-

bleness of a joint international rate, that it could proceed despite the absence of jurisdiction over the carrier handling the foreign portion of the movement; as to relief in the form of reparations, the ICC said:

> While the Commission is without power to order the carriers performing service outside of the United States to pay their proportional share of any amounts due as reparations, it may order the carriers performing the domestic portion of the challenged movements to pay reparations of the entire amount by which the rates are found to be unreasonable.

*NITCOM, supra,* 365 I.C.C. at 626–27 (footnote omitted). The Commission also said prospective relief would be ordered "if [it] ultimately [found] that the challenged joint rates are unreasonably high." *Id.* at 629; *see infra* note 33.

jurisdiction over Ford's complaint"? *See* 365 I.C.C. at 630, 631, 632. For the reasons stated in section III of this opinion, our answer is "Yes." The Commission had jurisdiction over the subject matter (market dominance and the reasonableness of the rate), and over Union Pacific. It should not have dismissed the complaint on its own motion for want of authority to adjudicate. The determination whether to proceed without MKT called for the exercise of judgmental discretion guided by considerations of equity and good conscience. *See supra* pp. 1160–1161.

Prime among those considerations, we think, is a situation the Commission never mentioned in its decision, although the ALJ apparently relied upon it in refusing to dismiss Ford's complaint: MKT had been a party defendant; that carrier was dropped voluntarily, but only after the ICC so ordered; elimination of MKT from the dispute was occasioned by a settlement agreement, filed with the Commission, establishing a rate allowance; the ICC had urged parties to savings provision rate challenges to negotiate such agreements and thereby avoid adversary contests. The Commission's response to the series of post-complaint events in this case, like the ICC's retroactive pronouncement in *DOD,* declared the rules of the game after the players had made their moves.

The Commission does not deny that it encouraged contract settlements without qualification. It addressed no special instructions to shippers challenging joint rates. It said to all savings provision disputants, a rate agreement is "far better" than an adjudication. It did not add, "except that in the case of joint service, the shipper settling with one carrier thereby relinquishes all rights against nonsettlers." It did not instruct, "unless all will settle, remain adverse to, and litigate against all; settle with, and dismiss none." Again, as in the *DOD* case, *see supra* pp. 1163–1165, the question here is not the tenor of permissible substantive Commission regulation; rather, the issue is one of fair notice, supplied at a time when persons who engage, or are subject to, the ICC's processes can conform their conduct to the Commission's expectations.

The ALJ who granted Ford's motion to drop MKT as a defendant subsequently ruled, in harmony therewith, that Ford's complaint against Union Pacific should be heard, not dismissed. The "precipitous action," as we view the case, was not Ford's or the ALJ's in recognizing that the settlement meant Ford and MKT were no longer adversaries.[31] Rather, it was the Commission's, in denying Ford any opportunity to proceed against the nonsettling defendant, Union Pacific, as a consequence of the settlement with MKT which Ford could reasonably believe conformed to vibrant ICC policy. Had the ICC adverted in its decisionmaking here to the settlement policy it had published, the Commission's sense of accountability for the fairness of its own actions might have been heightened.[32]

Under the circumstances, we believe the cases dealing with international rail rates are indeed apposite. *But cf.* 365 I.C.C. at 633 (declaring that line of cases "inapposite"). In this case too, the Commission should "remain prepared . . . to apply [its] rules and decisional criteria liberally to ensure that justice is not denied." *Id.* As the international rail rate cases demonstrate, when necessary to afford "relief to [shippers] with valid grievances," the Commission can and does determine market dominance and the reasonableness of a joint rate

---

**31.** We are not impressed by the logic of the ICC's position that two parties, authorized by Congress to resolve their dispute by contract, *see* 49 U.S.C. § 10713, and encouraged by ICC to do so, *see supra* pp. 1166–1167, must nonetheless continue as adversaries before the Commission.

**32.** The result the Commission reached, in addition to serving its own administrative convenience, may leave Union Pacific with a windfall. If there is market dominance, and the joint rate is unreasonably high, MKT has made amends, out of its divisional share of the rate, by the contract allowance accorded to Ford. But Ford continues to pay, and Union Pacific continues to collect and retain, now effectively with the ICC's approval, an excessive charge.

though all participants are not before the ICC as defendants. *NITCOM, supra,* 365 I.C.C. at 628. The "equitable principles" that moved the Commission to exercise its jurisdiction in *NITCOM,* and the flexible approach it took in that case,[33] should have served the Commission as well two days later when it decided the case at hand.[34]

We are invited to extend our inquiry beyond the propriety of the ICC's dismissal of Ford's initial complaint. The parties have briefed the issue whether the Commission should have permitted Ford to amend the complaint, after the 180-day deadline for rate challenges, to add a prayer for reparations.[35] We believe that issue is not ripe for judicial review. The ICC indulged in discussion that requires reconsideration in light of our opinion, but it ultimately declared that dismissal of the complaint for lack of jurisdiction rendered other procedural questions "moot." 365 I.C.C. at 634.

It also stated, specifically, that "the issue of Ford's attempt to amend its complaint need not be reached." *Id.* at 630.

We note the possibility that the ICC might have deferred any review of the ALJ's order had it perceived that there was no "jurisdictional" defect. The Commission generally observes a "final judgment" rule. Thus it noted in this case that, ordinarily, it does not entertain immediate appeals from an ALJ's denial of a motion to dismiss; instead, it awaits termination of proceedings before the ALJ and the entry of an initial decision. *Id.* at 631. The ICC did not say whether it also regards rulings such as the ALJ's denial of Ford's motion to amend as ultimately reviewable, but not immediately appealable.[36]

In sum, the Commission said its decision did not reach the issue of Ford's attempt to amend its complaint. Accordingly, we do

**33.** Ford asserts that the "ICC can structure its order so that it acts with respect to Union Pacific only and gives Ford needed relief." Opening Brief of Petitioner at 26; *see also* Reply Brief at 6–8. In international joint rate cases, the ICC has tailored relief in the manner Ford proposes here. *See, e.g., H.K. Porter Co. v. Central Vt. Ry., supra; NITCOM, supra.* In *NITCOM,* the ICC envisioned this course of action: If the Commission found the joint rate "unreasonably high, [it could] order the domestic carriers to cancel their participation. In the event that the joint rate is cancelled, [the ICC] will then examine the maximum reasonableness of any existing rates applicable to the U.S. portion of the movement. [The ICC] may then prescribe a maximum reasonable proportional rate for the domestic carriers, using cost evidence as a basis for the prescribed rate." 365 I.C.C. at 629. On remand, the Commission should determine whether this model can be applied to the situation this case presents.

**34.** We note again that the ICC can employ its subpoena power to obtain evidence, and can invite the voluntary participation of a carrier not named as a defendant. *See supra* notes 7 and 19.

**35.** Section 229 of the Staggers Act provides that a rate not "*challenged*" within the 180-day period "shall be deemed to be lawful and may not thereafter be challenged . . . ." 49 U.S.C. § 10701a note (savings provision) (emphasis supplied). Ford argues that its timely-filed complaint "challenged" the joint rate, as required by section 229, and that the amended

complaint seeking damages as well as a rate prescription for the future does not represent a new "challenge," but relates back to the date of the original complaint. *Cf.* Fed.R.Civ.P. 15(c) ("Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth . . . in the original pleading, the amendment relates back to the date of the original pleading."). The Commission has taken the position that "[a]ll complaints [pursuant to section 229] must be . . . [t]imely filed and complete by March 30, 1981"; "[b]roadening amendments," according to the ICC, "are inappropriate for lack of statutory foundation." Brief for the ICC in *Ford Motor,* Appendix D (Ex Parte No. 421, Complaints Filed Pursuant to the Savings Provisions of the Staggers Rail Act of 1980, not printed, served Nov. 9, 1981, at 3). *But cf. Ford Motor, supra,* 365 I.C.C. at 632 ("differing nature of the relief—[reparations for] past or [rate prescription for] present—does not warrant different treatment of the underlying reasonableness complaint"); J.A. 105 n. 1 (Commissioner Sterrett's statement that, regardless of remedy sought, reparations or future relief, standard for judging rate reasonableness is the same).

**36.** Ford and Union Pacific took opposing positions on this issue before the Commission. *Compare* J.App. 155–56 *with id.* at 144 n. 1, 170; *see supra* note 28. We leave to Commission determination on remand this question of the appropriate interpretation and application of the ICC's rules on the timing of administrative review.

not reach that question. We decide only that Ford's initial complaint, despite the dismissal of MKT as a defendant, remains securely within the ICC's adjudicatory authority. The ALJ correctly decided that issue; the Commission erred in upsetting his ruling.

### CONCLUSION

Some 800 Staggers Act "savings provision" rate complaints were filed with the Commission by March 30, 1981. An overburdened docket may have affected the ICC's decision in the cases on review. We are not insensitive to the pressures a case load bulge can generate. But Congress, when it afforded shippers a last opportunity to challenge rates as excessively high, no doubt envisioned a fairly-administered opportunity. Our decision setting aside the orders on review will enable the ICC to implement, in a testing situation, its avowed policy against interpreting procedural rules in a manner that prevents "adher[ence] to principles of fairness." *NIT-COM, supra,* 365 I.C.C. at 628.

For the reasons stated, the orders of the ICC on review in these cases are set aside and the matters are remanded to the Commission for further proceedings consistent with this opinion.

*It is so ordered.*